**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| **DOLORES JENSEN,** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **No. 3:12-CV-01490-BF** |
| | § | |
| **CAROLYN W. COLVIN,** | § | |
| **COMMISSIONER OF THE** | § | |
| **SOCIAL SECURITY ADMINISTRATION,** | § | |
| **Defendant.** | § | |

## MEMORANDUM OPINION AND ORDER

This is an appeal from the decision of the Commissioner of the Social Security Administration (the "Commissioner") denying the claim of Dolores Jensen ("Plaintiff") for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") benefits under Titles II and XVI, respectively, of the Social Security Act. The Court considered Plaintiff's Brief, Defendant's Response Brief, and Plaintiff's Reply Brief. The Court reviewed the record in connection with the pleadings. The Court AFFIRMS the final decision of the Commissioner.

## I. BACKGROUND[1]

### A. Procedural History

On July 29, 2010, Plaintiff completed an application for DIB and SSI benefits. (Tr. 130.) In her application, Plaintiff alleged a disability onset date of February 23, 2009, due to cirrhosis of the liver and anemia. (Tr. 152, 156.) The application was denied initially and upon reconsideration. (*See* Tr. 1-10, 77-82, 86-89.)

---

[1] The following background facts are taken from the transcript of the administrative proceedings, which is designated as "Tr."

Pursuant to Plaintiff's request, an Administrative Law Judge ("ALJ") held a hearing on May 4, 2011, at which Plaintiff and an impartial vocational expert ("VE") testified. (Tr. 28-66.) Plaintiff was  represented at the hearing by attorney Catherine I. Coates. (Tr. 28.) On July 25, 2011, the ALJ issued an unfavorable decision. (Tr. 8-27.) Plaintiff requested review from the Appeals Council on August 10, 2011, but her request was denied on April 17, 2012. (Tr. 1-7.) Thus, the ALJ's decision became the final decision of the Commissioner from which Plaintiff now seeks judicial review pursuant to 42 U.S.C. § 405(g).

### B. Plaintiff's Age, Education, and Work Experience

Plaintiff was born on November 2, 1963, making her 47 years old at the time of her hearing. (Tr. 36.) Plaintiff was 46 years old when she filed her application for disability. (Tr. 132.) Although Plaintiff has only a ninth grade education, she did obtain a GED and had vocational training as a pharmacy technician. (Tr. 37.) Plaintiff is 5'2" tall and weighs 143 pounds. (*Id.*) She has past relevant work as a pharmacy technician, retail salesperson, and bartender. (Tr. 36.)

### C. Plaintiff's Medical Evidence

Plaintiff's medical records are fairly extensive, containing approximately 250 pages of treatment records. The majority of the records concern Plaintiff's physical impairments; however, there are some records pertaining to Plaintiff's mental afflictions as well. The Court will summarize the relevant medical evidence.

Plaintiff's treatment records date back to June of 2007. (Tr. 495-502.) On June 27, 2007, Plaintiff sought treatment at Arlington Gastroenterology Services for rectal bleeding. (*Id.*) Thereafter, on August 9, 2007, she underwent an esophagogastroduodenoscopy and colonoscopy. (*Id.*) The

esophagogastroduodenoscopy revealed both gastritis and duodenitis, and the colonoscopy revealed hemorrhoids, a history of colon polyps, and diverticulosis. (*Id.*) Beginning in October of the same year, Plaintiff underwent various rounds of blood testing at Texas Oncology pursuant to the request of William T. Hamlim, DO ("Dr. Hamlin"), based on the belief that she might have been anemic.[2] (Tr. 306-432, 470-77.) In April of 2008, Plaintiff was diagnosed with thrombocytopenia, which Dr. Hamlin opined was related to possible alcoholic liver disease. (*Id.*) Plaintiff's medical records reference her alleged anxiety and major depression during this period of time. (Tr. 314, 316, 363.)

On June 30, 2008, Plaintiff was referred to The Liver Institute at Methodist Dallas ("The Liver Institute") to undergo further medical testing. (Tr. 255-81.) Plaintiff's initial physical examination  revealed spider angiomas, hepatomegaly, abnormal liver function tests, and possible end-stage liver disease ("ESLD") or cirrhosis of the liver. (Tr. 263.) Plaintiff was advised to immediately cease her alcohol consumption. (*Id.*) The following month, Plaintiff returned to The Liver Institute for another consultation with her physician, Abdullah Mubarak, M.D. ("Dr. Mubarak"). (Tr. 262.) Plaintiff proclaimed that she had been sober for approximately six weeks, but had yet to attend Alcoholics Anonymous, as was recommended by Dr. Mubarak. (*Id.*) On July 28, 2008, Dr. Mubarak gave Plaintiff permission to return to work. (*Id.*)

In early to mid-December of 2008, Plaintiff set sail on a five-day cruise, during which time she consumed a significant amount of alcohol but ate very sparingly. (Tr. 287.) On December 19, 2008, roughly two weeks after she returned from her cruise, Plaintiff had a near fainting episode at work. (*Id.*) Plaintiff's medical records indicate that she had purchased iron pills and took

---

[2] Plaintiff reported that she was bruising easily, having nose bleeds, and experiencing very heavy menstrual cycles.

3

approximately three doses simultaneously, followed by another dose, and then became deathly sick with vomiting and abdominal pain. (Tr. 285.) Consequently, she had a blood study performed by Dr. Hamlin. (*Id.*) Plaintiff was then admitted to Methodist Charlton Medical Center ("Methodist") on December 20, 2008, after test results revealed an abnormal blood count. (Tr. 287.) While at Methodist, Plaintiff's blood count showed pancytopenia with severe anemia and thrombocytopenia. (*Id.*) Findings from an abdominal ultrasound revealed the presence of a large amount of ascites, and also showed signs of hepatic cirrhosis. (Tr. 303.) Plaintiff reported that her alcohol abuse dated back to her early teenage years. (Tr. 287.) She also expressed past withdrawal problems with manifestations of visual hallucinations, tremulousness, and sweating. (*Id.*)

On May 15, 2009, Plaintiff returned to Methodist after having a bout of chronic hiccups. (Tr. 284, 493-94.) She underwent a chest examination, but the findings revealed no obvious discernable cause for the unrelenting hiccups. (Tr. 494.) The record reflects that Plaintiff appeared visibly icteric at the time of the chest examination. (*Id.*) Moreover, Plaintiff admitted that she continued to drink on a daily basis and smoked one pack of cigarettes per day. (*Id.*)

Plaintiff revisited The Liver Institute on July 15, 2009. (Tr. 261.) The record relates that Plaintiff was still drinking approximately seven alcoholic drinks, once per week. (*Id.*) Her physical examination revealed spider angiomas, hepatomegaly, anemia, and alcohol-related ESLD. (*Id.*) Plaintiff was apprised of the importance of remaining sober and was instructed to return for a follow-up consultation the proceeding month. (*Id.*)

Approximately two months later, on September 18, 2009, Plaintiff was hospitalized at Methodist due to severe thrombocytopenia or possible idiopathic thrombocytopenic purpura. (Tr. 257.) During her stay at Methodist, doctors opined that Plaintiff may have had possible alcohol

withdrawal, given the fact that she had abnegated her alcohol intake two days prior to her admission at Methodist. (*Id.*) On November 11, 2009, Plaintiff returned to The Liver Institute for her follow-up examination. (Tr. 260.) Plaintiff reported that she had been abstinent since September 16, 2009. (*Id.*) Dr. Mubarak diagnosed Plaintiff with ESLD due to alcohol consumption, as well as portal-systemic encephalopathy and depression. (*Id.*) Dr. Mubarak warned Plaintiff of the importance of maintaining sobriety and reiterated the long-term implications of continued alcohol use and its effects on the progression of chronic liver disease. (Tr. 257.) The treatment notes reveal that Plaintiff was to undergo an orthotopic liver transplantation evaluation after six months of sobriety. (Tr. 260.) Dr. Mubarak was of the opinion that "with [Plaintiff's] manifestation and decompensation of her chronic liver disease she should [not] be involved in any jobs that involve critical thinking, i.e. pharmacy technician, which could impact patient outcome." (Tr. 258.) To that end, Dr. Mubarak expressly supported Plaintiff's candidacy for disability. (*Id.*)

A physical residual functional capacity ("RFC") assessment was completed by Kavitha Reddy, M.D. ("Dr. Reddy") on August 24, 2010. (Tr. 433-40.) Dr. Reddy indicated that Plaintiff could perform light work.[3] Specifically, Dr. Reddy found that Plaintiff could stand and/or walk for a total of six hours in an eight-hour workday, sit (with normal breaks) for a total of six hours in an eight-hour workday, and push and/or pull without limitation. (Tr. 434.) Additionally, Dr. Reddy

---

[3] Light work is work that involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, one must have the ability to do substantially all of these activities. If an individual can do light work, he or she can also do sedentary work, unless there are additional limiting factors such as a loss of fine dexterity or inability to sit for long periods of time. 20 C.F.R. § 404.1567(b).

concluded that there were no postural, manipulative, visual, communicative, or environmental limitations. (Tr. 435-37.) Dr. Reddy commented that Plaintiff had evidence of splenomegaly and varices on her abdomen, but that her most recent exams negated ascites. (Tr. 440.) Furthermore, Dr. Reddy determined that Plaintiff's thrombocytopenia was proximately caused by her continued alcohol abuse and splenomegaly. (*Id.*)

Plaintiff alleges mental impairments as well. On December 29, 2010, Gerald H. Stephenson, Ph.D. ("Dr. Stephenson") performed a psychological evaluation of Plaintiff. (Tr. 483-89.) Plaintiff complained of severe depression and recounted instances of hallucinations, troubling thoughts, anxiety, and obsessive compulsive disorder.[4] (Tr. 483-84.) Plaintiff claimed to have abstained from consuming hard liquor during the previous six months, although she admitted to drinking alcohol the week prior to her evaluation with Dr. Stephenson. (Tr. 485.) Plaintiff also conceded that she abused "street drugs" during her twenties. (*Id.*)

As indicated by Dr. Stephenson's evaluation, Plaintiff's typical day ensues as follows: when Plaintiff wakes up, she first "has to watch all the news," and then "goes and sanitizes everything." (Tr. 484.) Next, she "packs things" in an effort to downsize, and takes a nap at eleven. (*Id.*) After her nap, Plaintiff performs typical household chores "that others can see." (*Id.*) She also walks the dogs often, goes out to eat regularly, attends sporting events with friends, and engages in conversation with the neighbors. (Tr. 484-85.)

---

[4] Plaintiff claimed to have heard the devil speak to her and tell her "he was going to take her." She stated that she was depressed "most of the time," but would hide it from others. Additionally, Plaintiff complained of bouts of extremely high or extremely low energy, and stated that she may go without sleep and then sleep for two days. She further attested that she "awakens happy and then will cry the rest of the day." Dr. Stephenson noted that Plaintiff denied the materialization of any suicidal or homicidal ideations.

Plaintiff reported that she has numerous acquaintances, as well as friends from her twenties that she "still keeps up with." (Tr. 485.) However, Plaintiff claimed that she "fakes a good feeling with others" and falls apart on a weekly basis "inside," breaking down in solitude. (*Id.*) As for her ability to complete tasks, Plaintiff alleged that she "can do things, but not on anyone else's schedule" because she "won't remember what she is supposed to do." (Tr. 483.) Be that as it may, Dr. Stephenson assessed Plaintiff of being able to complete tasks of moderate complexity and found that she had an average general mental ability.[5] (Tr. 485, 487.) Dr. Stephenson diagnosed Plaintiff with the following impairments: mood disorder (not otherwise specified); alcohol dependence (in partial remission); borderline personality disorder with abandonment issues, alcohol dependence, and drama; obsessive-compulsive disorder contributing to alcoholism; by history, end-stage liver disease from alcohol abuse; and stress factors conditioned by her disorder. (Tr. 487.) As a result, Plaintiff was assigned a Global Assessment of Functioning ("GAF") score of 60-65.[6] (*Id.*)

On January 27, 2011, Robert B. White, Ph.D. ("Dr. White") performed a psychiatric review technique and mental RFC assessment of Plaintiff. (Tr. 450-67.) Dr. White concluded that Plaintiff was not significantly limited in her ability to remember locations and work-like procedures, nor was

---

[5] In her visit with Dr. Stephenson, Plaintiff successfully completed the following tasks: registered three words in one trial and recalled them after three minutes; recalled her date and place of birth, social security number, and the first and sixteenth Presidents; followed three-step instructions; and spelled "world" backwards.

[6] A GAF score represents a clinician's judgment of an individual's overall level of functioning. *See* AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed. text rev. 2000) (DSM). A GAF score of 51-60 is indicative of moderate symptoms or any moderate difficulty in social, occupational, or school functioning. *Id.* A GAF score of 61-70 is indicative of some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well, with some meaningful interpersonal relationships. *Id.*

she significantly limited in her ability to understand, remember, and carry out very short and simple instructions. (Tr. 464.) Likewise, Plaintiff was found not to be significantly limited in her ability to perform activities within a schedule, maintain regular attendance, sustain an ordinary routine without special supervision, work in coordination with others without distraction, make simple work-related decisions, and perform consistently. (Tr. 464-65.) However, Dr. White did find Plaintiff to be moderately limited in her capacity to understand, remember, and carry out detailed instructions, as well as in her ability to maintain attention and concentration for extended periods of time. (Tr. 464.)

With respect to social interaction, Plaintiff's ability to interact appropriately with the general public, ask simple questions or request assistance, and maintain socially appropriate behavior was deemed to be not significantly limited. (Tr. 465.) Similarly, Dr. White indicated that Plaintiff had no impediments with respect to her ability to be aware of normal hazards and take precautions, travel in unfamiliar places, use public transportation, or set realistic goals. (*Id.*) On the other hand, Dr. White determined that Plaintiff was moderately limited in her ability to accept instructions, respond appropriately to criticism, get along with others, and respond appropriately to changes in the work setting. (Tr. 464-65.) All things considered, Dr. White concluded that Plaintiff's alleged limitations were not fully supported by the evidence.[7] (Tr. 466.)

### D. Plaintiff's Testimony at the Hearing

Plaintiff, represented by counsel, testified on her own behalf at a hearing held on May 4, 2011. (Tr. 28-66.) Plaintiff stated that she completed the ninth grade, received her GED, and had vocational training as a pharmacy technician. (Tr. 37.) She claimed that she was removed from her

---

[7] Dr. White also noted that information contained in both the psychological evaluation and third party function report suggested symptom embellishment. (Tr. 462.)

job as a pharmacy technician in September of 2009 due to exhaustion. (*Id.*) Plaintiff was diagnosed with liver disease in 2008, and, as a result, alleged that she had fatigue and that she "can't lift anything really." (Tr. 38-39.) After she adjourned from working as a pharmacy technician in 2009, Plaintiff continued to drink despite the fact that she was repeatedly apprised not to do so.[8] (Tr. 39.)

Plaintiff maintained that she quit drinking for six months in 2010, but admitted that she "drank a little bit" during the Christmas holidays of that year. (Tr. 41.) At the time of the hearing, Plaintiff testified that she was no longer drinking alcohol and thought her last drink was at "[t]he beginning of April," although she could not give any dates. (Tr. 41-42.) She then admitted to having "a couple of drinks" after the Christmas period, "but not very many." (Tr. 42.) To that extent, Plaintiff reported initially that she consumed "maybe a drink a week," but then claimed that she had "probably a drink a month" or "[n]ot that much, maybe," because she was trying to stop altogether. (*Id.*) Plaintiff also mentioned that her doctor had setup an in-house treatment program for her to attend for twenty-eight days, but that she had to postpone it because of the hearing. (Tr. 43.)

While Plaintiff was working as a bartender and a pharmacy technician, she was lifting "very heavy" loads. (Tr. 44.) The heaviest item that she lifted as a bartender was a "full keg," and she could do so with one arm. (*Id.*) While performing her duties as a pharmacy technician, she had to move 40-pound boxes up three flights of stairs. (*Id.*) At the time of the hearing, Plaintiff insisted that she was unable to lift even an empty box. (*Id.*) She subsequently testified that she was capable of carrying a "12-pack of Coke."[9] (Tr. 49.)

---

[8]   The record reflects that during this period, Plaintiff's liver disease remained classified as cirrhosis, and she was uncertain as to when her liver disease escalated to end-stage. (Tr. 40.)

[9] The Court notes that in her latest Function Report dated November 3, 2010, Plaintiff reported that she could lift "20 lbs." (Tr. 209.)

Plaintiff also purported to have problems with dizziness, balancing, and depression. (Tr. 44-45.) With respect to depression, she claimed to have nightmares, anxiety attacks, and bouts of crying on a weekly basis. (Tr. 45.) She also maintained that she had problems with forgetfulness, such as forgetting to take her pills, leaving the stove on, and leaving the water running. (*Id.*) Plaintiff testified that if she had money coming in, she would not be able to manage it or pay the bills. (Tr. 50.) When asked if she would be able to manage her money if she were to pay for her obligations in cash, Plaintiff replied that she "still wouldn't find the bill" and often threw money away accidentally, "thinking it's paper." (*Id.*) Further, she proclaimed to have difficulty concentrating, and alleged that she frequently starts projects and neglects to finish them. (Tr. 45-46.) In spite of her alleged hindrances, Plaintiff verified that she was capable of operating a motor vehicle. (Tr. 53.)

On the topic of anxiety, Plaintiff asserted that an attack could be initiated by anything, such as when she has to "make a decision," "go meet company," or "go to an event with a lot of people there." (Tr. 46-47.) However, she later established that she and her fiancé frequently go to dinner with their friends and sit out by their pools. (Tr. 50.) Plaintiff also recanted that she has to sanitize everything, and described the procedure wherein she wipes surfaces down with detergent, repeats the process with bleach water, and then once more with alcohol.[10] (Tr. 47.)

When questioned whether she could walk the length of a football field, i.e. 100 yards, without stopping, Plaintiff replied that she "could probably make it, but very slowly." (Tr. 47-48.) She then confirmed that she could walk back across, but would likely need to rest before doing so. (Tr. 48.) Likewise, Plaintiff testified that she could stand only for five to ten minutes at a time and purported

---

[10] The Court also notes that in the Disability Report dated August 22, 2010, Plaintiff stated that someone does the cleaning for her. (Tr. 197.)

to have difficulty sitting due to a pain in her stomach that emits a "poking throbbing feeling."[11] (*Id.*) She also alleged that she has to lie down approximately four times every day at varying intervals. (Tr. 51.) Moreover, Plaintiff testified that she "frequently" (at least three days out of the month) spends the entire day in bed, especially if she "go[es] out and go[es] to the mall with [her] boyfriend or something . . . ." (Tr. 51-52.)

### E. The Vocational Expert's Testimony at the Hearing

The VE testified at the hearing regarding jobs in the national economy which Plaintiff was capable of performing. The ALJ first posed the following hypothetical: assume a person of Plaintiff's age, education, and experience who can lift and carry twenty pounds occasionally and ten pounds frequently; can sit, stand, and walk for six hours in an eight-hour workday; can occasionally climb ramps or stairs; cannot climb ladders, ropes, or scaffolds; cannot balance; can occasionally stoop, crouch, crawl, or kneel; and retains the ability for detailed, but not complex instructions. (Tr. 57.) The ALJ then inquired as to whether this hypothetical person could perform any of Plaintiff's past work. (*Id.*) The VE responded in the affirmative, and stated that the bartender, retail sales (clothing but not appliances), and pharmacy technician positions all would comport with the hypothetical in question. (*Id.*)

The ALJ then offered the same hypothetical, but modified the instructions from "detailed and not complex" to "one to two step." (Tr. 58.) The VE replied that Plaintiff's past work would be eliminated; thus, the hypothetical person would be capable of performing only light and unskilled

---

[11] The Court notes that in the Function Report completed on November 3, 2010, Plaintiff reported that it takes her ninety minutes to shop for food. (Tr. 207.) Moreover, in the Third Party Function Report submitted on December 7, 2010, Don C. Hawkland, Plaintiff's friend, reported that Plaintiff shops for groceries and clothes weekly, which takes her a "few hours." (Tr. 215.)

work in assembly, hand-packing, and inspecting-type positions. (*Id.*) Regarding the assembly-type positions, the VE explained that there were approximately 300,000 jobs in the nation and 20,000 in Texas. (*Id.*) Likewise, there were approximately 100,000 hand-packing type positions in the nation, 6,500 of which were available in Texas. (*Id.*) As for the inspecting-type positions, the VE estimated that there were 200,000 positions in the nation and 15,000 in Texas. (*Id.*) The VE proclaimed that her testimony was consistent with the Dictionary of Occupational Titles ("DOT").[12]

The ALJ then revisited the first hypothetical, which entailed an instruction level of "detailed and not complex," and lessened the exertion level to "sedentary." (Tr. 59.) In light of the reduced exertion level, the VE contended that entry-level positions, such as appointment setters, telephone solicitors, and dispatchers, remained available for the hypothetical person to perform. (*Id.*) The VE estimated that there were upwards of 190,000 appointment setter positions in the nation and 12,000 in Texas. (*Id.*) With respect to the telephone solicitors, the VE stated there were approximately 300,000 positions in the nation, 20,000 of which were found in Texas. (*Id.*) The dispatcher positions were not as plentiful, with roughly 15,000 jobs in the nation and 2,000 in Texas. (*Id.*)

Lastly, the ALJ modified the previous hypothetical and modified the instructions from "detailed and not complex" down to "one to two step." (Tr. 60.) In response, the VE reported that there are sedentary, unskilled, assembly-type positions and inspecting-type positions which fall within the parameters of the altered hypothetical. (*Id.*) The VE testified that there were approximately 120,000 assembly-type positions in the nation, 6,000 of which were in Texas. (*Id.*) Additionally, the VE stated that there were around 16,000 inspecting-type positions in the nation, and

---

[12] The DOT is a standardized volume of job definitions that the Social Security Administration relies on at steps four and five of its five-step disability determination process. SSR 00-4p, 2000 WL 1898704, at *2.

4,000 in Texas. (*Id.*) Although there were more jobs which fit the criteria of the hypothetical in question, the VE noted that the two aforementioned groups were the largest groups available at the time of the hearing. (*Id.*) The VE also mentioned that employers will tolerate a maximum of one to two instances of absenteeism per month if an individual is to sustain employment in any of the foregoing sectors. (*Id.*)

Upon cross-examination, Plaintiff's counsel posited the following hypothetical: assume a person of Plaintiff's age, education, and experience who is limited to walking approximately 100 yards slowly; can stand only five to ten minutes at a time; cannot bend, climb, push, or pull; can lift ten pounds occasionally; and can sit six hours in an eight-hour workday, with a sit-stand option at will. (Tr. 61.) The VE testified that the jobs of the appointment setter, the telephone setter, and the dispatcher would fall within the ambit of the newly proposed hypothetical. (Tr. 63.)

Plaintiff's counsel subsequently modified her proposed scenario, whereby the hypothetical individual is moderately limited (i.e. limited twenty percent of the time) in their abilities to: understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods of time; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting or exhibiting behavioral extremes; and respond appropriately to any changes in the work setting. (Tr. 63-64.) The VE attested that the moderate limitation, which would result in a mere eighty percent rate of productivity, would fall short of the employer's expectations, thereby precluding the hypothetical person from engaging in any of the preceding positions. (Tr. 64.) The VE further clarified that if a hypothetical individual needed to lie down four times a day, any possibility of competitive employment would be eliminated. (*Id.*)

13

### F. The Decision of the ALJ

In rendering a decision on July 25, 2011, the ALJ analyzed Plaintiff's claim pursuant to the standard five-step sequential evaluation process.[13] At step one, the ALJ determined that Plaintiff had engaged in substantial gainful activity ("SGA") from her alleged onset date, February 23, 2009 through October 31, 2009, but had not engaged in SGA since that time. (Tr. 14.) At step two, the ALJ found that Plaintiff's alcohol dependence, alcoholic liver disease, anemia, thrombocytopenia, mood disorder, borderline personality disorder, and obsessive-compulsive disorder were severe impairments, as the impairments had more than a "minimal effect on her ability to work."[14] (*Id.*) At step three, the ALJ determined that Plaintiff's impairments did not meet or medically equal the requirements of any listed impairments for presumptive disability under the Social Security Regulations. (Tr. 14-15.)

Before proceeding to step four, the ALJ concluded that Plaintiff retained the following RFC: lift and carry ten pounds occasionally and less than ten pounds frequently; push or pull ten pounds occasionally and less than ten pounds frequently; stand and walk two hours out of an eight-hour workday; sit for six hours out of an eight-hour workday with the option to stand and stretch or change positions for two minutes every thirty minutes; occasionally climb stairs and ramps; stoop, crouch, crawl, or kneel; perform work where interpersonal contact is incidental to the work performed; and perform work that involves one to two step instructions. (Tr. 16.) The ALJ found that

---

[13] (1) Is the claimant currently working? (2) Does she have a severe impairment? (3) Does the impairment meet or equal an impairment listed in Appendix 1? (4) Does the impairment prevent her from performing her past relevant work? (5) Does the impairment prevent her from doing any other work? 20 C.F.R. § 416.920.

[14] *See Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985).

Plaintiff was unable to balance or climb ropes, ladders, or scaffolds. (*Id.*) In addition, the ALJ determined that Plaintiff would be absent from work four days per month due to her fatigue. (*Id.*)

At step four, the ALJ determined that Plaintiff was unable to perform her past relevant work. (Tr. 17.) At step five, the ALJ found, based on Plaintiff's age, education, work experience, and RFC, in conjunction with the testimony of the VE, that there were no jobs which exist in significant numbers in the national economy which Plaintiff could perform. (*Id.*) Hence, the ALJ concluded that a finding of "disabled" was appropriate under the applicable framework. (Tr. 18.)

Upon finding that Plaintiff was disabled, the ALJ revisited the five-step analysis once more under the assumption that Plaintiff had discontinued her substance use. (Tr. 18-21.) At step two, the ALJ found Plaintiff's combination of remaining impairments (alcoholic liver disease, anemia, thrombocytopenia, mood disorder, borderline personality disorder, and obsessive-compulsive disorder) to be severe. (Tr. 18.) At step three, the ALJ determined that Plaintiff's remaining impairments did not meet or equal the criteria of any Medical Listing. (*Id.*) The ALJ concluded that if Plaintiff ceased her substance abuse, she would retain the following RFC: Plaintiff would be able to lift and carry twenty pounds occasionally and ten pounds frequently; push or pull twenty pounds occasionally and ten pounds frequently; stand and/or walk for six hours out of an eight-hour workday; sit for six hours out of an eight-hour workday; climb stairs and ramps occasionally; stoop, crouch, crawl, and kneel occasionally; and perform work that involved detailed but not complex instructions. (Tr. 20.) However, the ALJ found that Plaintiff would not be able to balance or climb ladders, ropes, or scaffolds. (*Id.*) At step four, the ALJ determined that if Plaintiff stopped the substance use, she would be able to perform past work as a bartender and retail clothing salesperson (Tr. 22.) In other words, the ALJ ruled that alcohol was a contributing factor material to the finding

of disability. (Tr. 23.)  Hence, Plaintiff had not been disabled within the meaning of the Social

Security Act at any time from the alleged onset date through the date of the ALJ's decision. (*Id.*)

## II. STANDARD OF REVIEW

To be entitled to social security benefits, a plaintiff must prove that she is disabled for

purposes of the Social Security Act. *Leggett v. Chater*, 67 F.3d 558, 563–64 (5th Cir. 1995); *Abshire*

*v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security

Act is "the inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which has

lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §

423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is

disabled. Those steps are:

1. An individual who is working and engaging in substantial gainful activity will not
   be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be
   disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the
   regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work the individual has done in the past,
   a finding of "not disabled" must be made.

5. If an individual's impairment precludes her from performing her past work,
   other factors including age, education, past work experience, and residual functional
   capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the inquiry, the burden lies with the claimant to prove her disability. *Leggett*, 67 F.3d at 564. The inquiry terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

The Commissioner's determination is afforded great deference. *Leggett*, 67 F.3d at 564. Judicial review of the Commissioner's findings is limited to whether the decision to deny benefits is supported by substantial evidence and to whether the proper legal standard was utilized. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C.A. § 405(g). Substantial evidence is defined as "that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett*, 67 F.3d at 564. The reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment; rather, the reviewing court scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. At the end of the day,  "[t]he ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision, as adopted by the Appeals Council." *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000).

## III. ISSUES

1.      Whether substantial evidence supports the ALJ's finding that Plaintiff was disabled but her alcohol use was material to her disability; and

2.      Whether substantial evidence supports the ALJ's findings as to Plaintiff's credibility and RFC and, if not, whether those unsupported findings prejudiced Plaintiff.

## IV. ANALYSIS[15]

### A. Whether Plaintiff's substance abuse was material to her disability

Plaintiff contends that substantial evidence does not support the ALJ's determination that alcohol was a contributing factor material to the finding of her disability. (Pl.'s Br. at 8.)  Public Law 104-121 eliminated both alcoholism and drug addiction as a basis for obtaining disability benefits. *See* Pub. L. No. 104-121, §105, 110 Stat. 847, 852-855 (1996) (amending 42 U.S.C. §§ 423(d)(2)(C) and 1382(c)). Thus, if an ALJ makes a determination of disability, and there is evidence of substance abuse, the ALJ must determine whether the substance abuse is a contributing factor material to the disability inquiry. 20 C.F.R. § 404.1535(a).

In determining whether drug or alcohol addiction is a contributing factor material to the determination of disability, the ALJ considers whether a claimant would still be found disabled if she discontinued using drugs or alcohol. 20 C.F.R. § 404.1535(b)(1). If a claimant's remaining limitations after discontinuing substance abuse would not be disabling, drug or alcohol addiction is a contributing factor material to the determination of disability, and the claimant will be found not disabled for purposes of receiving benefits. 20 C.F.R. § 404.1535(b)(2)(I). The burden is on the claimant to prove that her remaining limitations would be disabling in the absence of drug or alcohol

---

[15] Various segments of the analysis are taken from Plaintiff's Brief, which is designated as "Pl.'s Br."

addiction. *See Brown v. Apfel*, 192 F.3d 492, 498 (5th Cir. 1999) (the claimant is the party best suited to demonstrate whether or not the disability would remain in the absence of drug or alcohol addiction). Evidence sufficient to support an ALJ's materiality finding with respect to drug or alcohol abuse is largely dependent upon the facts in each case. *Brown*, 192 F.3d at 499. "On the other hand, the ALJ must support his determination regarding the effect of the claimant's substance abuse with substantial evidence." *Cravin v. Astrue*, No. 5:07-CV-222-C, 2008 WL 2923867, at *3 (N.D. Tex. July 30, 2008) (citing *Brown*, 192 F.3d at 499).

Here, the ALJ found Plaintiff disabled at step five, as she was unable to perform past relevant work or any other gainful and substantial work in the national economy. (Tr. 17-18.) This decision was predicated not on the fact that Plaintiff's impairments met one of the Medical Listings, as that would mandate presumptive disability under step three, but rather, on the RFC formulated by the ALJ. (*Id.*) The ALJ found that Plaintiff would be incapable of light work, she would have numerous restrictions, and she would be absent from work four days each month due to her fatigue. (Tr. 16-18.) The VE testified at the hearing that "one to two instances of absenteeism per month is about all [employers] will tolerate." (Tr. 60.) Thus, the ALJ found Plaintiff incapable of maintaining employment. Be that as it may, the ALJ also found that there was medical evidence of substance use. (Tr. 16-17.) As a result, the ALJ followed the dictates of the regulations and assessed Plaintiff's remaining physical and mental limitations in the absence of her alcohol use. (Tr. 18-23.)

In consideration of the analysis and findings of the ALJ, it is clear that the ALJ followed the proper procedure in analyzing Plaintiff's substance abuse as it pertained to her claim for disability. Based upon the medical records, the ALJ determined that Plaintiff's sobriety could not be confirmed, and found that "[i]t is likely that [Plaintiff's] alcohol dependence continues to exacerbate her

19

physical impairments and results in her having the physical limitations . . . ." (Tr. 17, 21.) As such, the ALJ concluded that, were she to maintain her sobriety, it is unlikely Plaintiff would have any issues with absenteeism at work. (Tr. 21.) Ultimately, after scrutinizing the medical records and pointing to an array of conflicting evidence suggesting that Plaintiff had been drinking from the alleged onset date through the date of the hearing, the ALJ determined that Plaintiff would not be disabled absent her alcohol abuse. (Tr. 22-23.)

The ALJ's determination will be upheld if there is substantial evidence to support the finding that Plaintiff's alcohol use was a contributing factor material to the disability determination. *See, e.g.*, *Cravin*, 2008 WL 2923867, at *3. In this case, the ALJ considered, *inter alia*, evidence detailed in the following paragraphs in determining that Plaintiff's alcohol abuse was a contributing factor material to the disability determination.

First, the medical records indicate that Dr. Mubarak, Plaintiff's treating physician, gave credence to Plaintiff's contention that she was sober for approximately six to eight months at the time of her evaluation on April 12, 2011. (Tr. 20.) In addition, Plaintiff testified at the May 4, 2011 hearing that she was no longer drinking alcohol. (Tr. 41.) However, the ALJ found Plaintiff's claimed periods of sobriety to be far from credible, given her conflicting testimony at the hearing and the various discrepancies in the medical records.[16] (Tr. 16, 20-21.) In any case, the medical records shed light on the fact that Plaintiff's fatigue was directly correlated to her diagnoses of anemia,

---

[16] Plaintiff initially claimed that she stopped drinking for roughly six months only during 2010, although she could not specify the months during which she was sober. Subsequently, Plaintiff testified that she consumed alcohol during the 2010 Christmas holiday period. She then changed her testimony yet again and claimed to have consumed alcohol in April of 2011.

pancytopenia, and thrombocytopenia, which were her primary physical impairments.[17] (*See, e.g.*, Tr. 286, 310-11, 315-16, 326; *see also* Pl. Br. at 12.) Moreover, the medical records elucidate that Plaintiff's physical impairments are directly tied to her continued alcohol abuse.[18] (Tr. 440.) In fact, medical records illustrate that during Plaintiff's brief abstinence from alcohol, her energy levels increased. (*See, e.g.,* Tr. 325.)

Secondly, the ALJ's ultimate RFC assessment of Plaintiff, absent her alcohol abuse, is consistent with the physical and mental RFC assessments of Drs. Reddy and White. The ALJ found that Plaintiff could perform light work based on the findings made by Dr. Reddy, the medical consultant who performed Plaintiff's physical RFC assessment. (Tr. 433-40.) After taking into consideration Plaintiff's continued alcohol dependence, Dr. Reddy found that Plaintiff could lift and/or carry twenty pounds occasionally, and ten pounds frequently; sit, stand and walk six hours in an eight-hour workday; and push or pull twenty pounds occasionally and ten pounds frequently. (Tr. 434.) Moreover, Dr. Reddy noted that Plaintiff's alleged limitations were only partially supported by the evidence. (Tr. 438.) Consistent with the medical evidence, the ALJ ultimately determined that Plaintiff would retain the physical RFC assigned by Dr. Reddy if she ceased her alcohol consumption. (Tr. 16, 20-21.)

Additionally, Dr. White, the psychologist who performed Plaintiff's psychiatric review technique and mental RFC assessment, assigned Plaintiff a GAF score of 60-65, indicating only

---

[17] The Court notes that in nearly all of Plaintiff's medical visits where she complained of fatigue, she is diagnosed with thrombocytopenia and/or anemia. Moreover, Plaintiff contends in her brief that it is common knowledge that "prolonged and/or advanced liver disease can cause severe fatigue," and that "[p]ancytopenia and anemia can also cause fatigue and weakness."

[18] Dr. Reddy commented, "[Plaintiff's] thrombocytopenia is the result of continued alcohol abuse and splenomegaly."

moderate or mild symptoms, even after considering her alcohol dependence. (Tr. 450-67.) Dr. White noted that, "overall [there is] no support for any significant cognitive limitations" and that "[Plaintiff] requires no special supervision." (Tr. 462.) Of equal importance, Dr. White concluded that Plaintiff was not significantly limited in her ability to perform scheduled activities, *maintain regular attendance*, be punctual within customary tolerances, complete a normal workday without interruptions, and perform consistently without an unreasonable number and length of rest periods. (Tr. 464-65.) All things considered, Dr. White determined that Plaintiff's alleged limitations were not fully supported by the evidence. (Tr. 466.)

Finally, at the May 4, 2011 hearing, Plaintiff alleged that her fatigue was the catalyst behind her need to be absent from work four days per month. The VE, in response, stated that Plaintiff's rate of absenteeism exceeded the standard two-day limit permitted by employers in the national economy, thereby rendering her unemployable. The ALJ relied on the VE's testimony in rendering the initial determination as to Plaintiff's disability. However, the medical records, taken as a whole, reflect that Plaintiff's fatigue was directly correlated to her alcohol consumption. As such, the ALJ determined that if Plaintiff discontinued her alcohol abuse she would no longer experience fatigue. Thus, Plaintiff's fatigue was not a remaining limitation considered by the ALJ, and she would no longer need to be absent from work four days per month.

Based upon the aforementioned evidence, the Court finds that there is substantial evidence to support the ALJ's ultimate finding that Plaintiff's alcohol use was a contributing factor material to the determination of disability and that, absent such alcohol use, Plaintiff was not disabled. Therefore, the Court concludes that remand is not required.

**B. Whether the ALJ's findings as to Plaintiff's credibility and considerable fatigue were supported by substantial evidence**

Plaintiff contends that the ALJ improperly discounted her credibility and subjective complaints of fatigue when making the RFC findings. (Pl.'s Br. at 11.) However, in the initial RFC determination, the ALJ accepted as true Plaintiff's testimony that she would be absent from work four days out of each month due to her considerable fatigue. Nonetheless, as previously discussed, Plaintiff's substance use was material to Plaintiff's fatigue, and thus, the ALJ found Plaintiff's fatigue was not a remaining limitation and properly excluded it from the second RFC finding. As a result, the Court declines to revisit Plaintiff's argument pertaining to the ALJ's findings on Plaintiff's fatigue, and will consider only whether the ALJ's finding as to Plaintiff's credibility was supported by substantial evidence.

In determining Plaintiff's RFC, the ALJ must consider all the Plaintiff's symptoms and the extent to which they are consistent with the objective medical evidence and other evidence. 20 C.F.R. § 416.929. There is a two-step process for evaluating symptoms: (1) the ALJ must determine whether there are underlying medically determinable physical or mental impairments that could reasonably be expected to produce the claimant's pain or other symptoms; and (2) the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms and decide the extent to which these symptoms limit the claimant's ability to perform basic work activities. SSR 96-7p, 1996 WL 374186, at *2. If there are no medically determinable physical or mental impairments, or if there is a medical impairment but it is not reasonably capable of producing the alleged pain or symptoms, the symptoms cannot be found to affect the claimant's basic work abilities. *Id.*

Whenever the claimant's statements regarding the intensity, persistence, or limiting effects of her symptoms are not consistent with the objective medical evidence, it is within the province of the ALJ to make a finding as to the credibility of the claimant's statements. *Id.* at *1-2. There are certain factors the ALJ may consider when additional information is needed to evaluate the credibility of the claimant's statements: (1) daily activities of the claimant; (2) location, duration, frequency, and intensity of symptoms; (3) aggravating factors; (4) medication and side effects therefrom; (5) treatment received for symptoms; (6) other measures taken to relieve symptoms; and (7) any other factors concerning restrictions due to pain or symptoms. *Id.* at *3.

An ALJ's credibility findings on a claimant's subjective complaints are entitled to considerable deference by a reviewing court. *See Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001). However, the ALJ's credibility determination must be grounded upon specific reasons, supported by the case record, and sufficiently specific to clearly illustrate the weight given to the claimant's statements and the reasons therefor. *Id.* at *2.

In the case at hand, the ALJ found that if Plaintiff discontinued the substance use, her "medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that [her] statements concerning the intensity, persistence and limiting effects of these symptoms" lacked sufficient credibility. (Tr. 22.) Contrary to Plaintiff's contentions, the ALJ did, in fact, explain as to how the objective evidence undermined her allegations of fatigue and weakness. (*See* Tr. 20-22.) For example, the ALJ stated that "[a]lthough the [Plaintiff] may suffer some pain and symptoms from her condition, the undersigned finds that the record does not support her underlying contention of total disability." (Tr. 22.) More specifically, the ALJ focused on Plaintiff's treatment, or lack thereof, and referenced the fact that Plaintiff's doctor strongly encouraged her to

attend in-patient substance abuse treatment, yet she failed to attend. (Tr. 21.) This particular factor significantly undermined Plaintiff's allegation that she had finally discontinued drinking, and thus, weakened her credibility. (*Id.*) The Court agrees with the ALJ's statement that "[i]t is reasonable to believe that if the [Plaintiff's] impairments were as disabling as alleged that she would comply with her treatment regimen and stop her substance abuse."[19] (Tr. 22.) *See Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990) (the ALJ may consider a claimant's lack of treatment as an indication of non-disability).

Plaintiff's credibility is further undermined by the vacillating testimony regarding her alleged periods of sobriety. As previously discussed, the ALJ properly discounted Plaintiff's credibility in light of her conflicting testimony at the hearing and various inconsistencies in the medical records. (Tr. 16, 20-21.) Originally, Plaintiff proclaimed that she curbed her alcohol consumption for approximately six months during 2010, yet she was unable to specify the months during which she was sober. (Tr. 41.) Thereafter, Plaintiff testified that she consumed alcohol during and after the 2010 Christmas holiday period, but denied any continued alcohol use as of the date of the hearing. (*Id.*) Plaintiff then remarked that her last drink was "[a] couple of months" before the hearing. (*Id.*) By way of contrast, Dr. Mubarak reported in his treatment notes that Plaintiff had been sober for roughly six to eight months as of April 12, 2011. (Tr. 479.) By the same token, Plaintiff changed her testimony once more and reported that her last drink was at "[t]he beginning of April," a month before the hearing. (Tr. 41.)

---

[19] The Court notes that Plaintiff was interminably instructed by her physicians to stop drinking but she declined to do so.

Overall, the ALJ concluded that the medical records did not contain the requisite objective evidence necessary to substantiate Plaintiff's subjective complaints. Case law dictates that subjective complaints must be corroborated, at least in part, by objective evidence. *See Houston v. Sullivan*, 895 F.2d 1012, 1016 (5th Cir. 1989). As such, Plaintiff's alleged subjective impairments could not be found to affect her work abilities. Accordingly, substantial evidence supports the ALJ's decision to discount Plaintiff's credibility and considerable fatigue in making the ultimate RFC finding. *See* SSR 96-7p, at *2.

### V. CONCLUSION

For the foregoing reasons, the Court AFFIRMS the final decision of the Commissioner, as it is supported by substantial evidence, and DISMISSES Plaintiff's Complaint with prejudice.

**SO ORDERED**, June 25, 2013.

_____
PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE